UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT F. KENNEDY, JR,

      Plaintiff,

v

JOCELYN BENSON, in her official
capacity as Michigan Secretary of State,

      Defendant.

No. 24-cv-12375

HON. DENISE PAGE HOOD

_____/

Brandon L. Debus (P81159)
Attorney for Plaintiffs
2600 West Big Beaver Road, Suite 300
Troy, Michigan 48084
248.433.7200
bdebus@dickinson-wright.com

Heather S. Meingast (P55439)
Erik A. Grill (P64713)
Assistant Attorneys General
Attorneys for Defendant Benson
P.O. Box 30736
Lansing, Michigan 48909
517.335.7659
meingasth@michigan.gov.
grille@michigan.gov

_____/

**DEFENDANT SECRETARY OF STATE JOCELYN BENSON'S
RESPONSE IN OPPOSITION TO PLAINTFF'S EMERGENCY MOTION
FOR TEMPORARY RESTRAINING ORDER**

Heather S. Meingast (P55439)
Erik A. Grill (P64713)
Assistant Attorneys General
Attorneys for Defendants
PO Box 30736
Lansing, Michigan 48909
517.335.7659
meingasth@michigan.gov
grille@michigan.gov

Dated:  September 12, 2024

# TABLE OF CONTENTS

Page

Table of Contents ................................................................................. i

Index of Authorities ........................................................................... iii

Concise Statement of Issue Presented ................................................ vii

Introduction .........................................................................................1

Statement of Facts ...............................................................................2

    Michigan's filing requirements for minor party candidates.............2

    The Court of Claims rules against Plaintiff keeping him on the ballot..........4

    The Court of Appeals reverses and removes Kennedy from the ballot .........4

    The Michigan Supreme Court reverses and orders Kennedy back on
        the ballot ................................................................................4

    The Secretary calls the election and confirms Kennedy is a candidate .........5

    Plaintiff files suit in this Court a day later and after hours.............6

Argument..............................................................................................7

I.    Plaintiff's request for an injunction should be denied where he has not
satisfied any of the factors necessary for granting such relief. .......7

    A.    Temporary or preliminary injunction factors........................7

    B.    Plaintiff has no likelihood of succeeding on the merits.......8

        1.    Plaintiff's claims are barred by laches........................8

        2.    Plaintiff's claims are barred by the doctrine of res
judicata ..................................................................13

        3.    Plaintiff's article II, § 1 claim is without merit.........17

        4.    Plaintiff's Fourteenth Amendment claim is without merit.......21

     5.    Plaintiff's First Amendment claim is without merit. ................26

C.    Plaintiff has not demonstrated irreparable harm .................................32

D.    The balance of harms and the public interest weigh against granting the injunction .........................................................................33

Conclusion and Relief Requested .............................................................36

Certificate of Service (e-file) ....................................................................37

# INDEX OF AUTHORITIES

Page

**Cases**

*Adair v. State Dept. of Ed.*, 680 N.W.2d 386 (2004)........................................ 14, 16

*Anderson v. Celebrezze*, 460 U.S. 780 (1983)........................................... 17, 21, 25

*Brown-Graves Co. v. Central States, Southeast and Southwest Areas Pension Fund*, 206 F.3d 680 (6th Cir. 2000) ........................................................8

*Burdick v. Takushi*, 504 U.S. 428 (1992)......................................................... 21, 30

*Certified Restoration Dry Cleaning Network v. Tenke Corp.,* 511 F.3d 535 (6th Cir. 2007) ............................................................................................32

*Cf. Tennessee Scrap Recyclers Ass'n v. Bredesen,* 556 F.3d 442 (6th Cir. 2009).......................................................................................................7

*Cook v. Gralike*, 531 U.S. 510 (2001) .....................................................................28

*Crawford v. Marion County Election Bd,* 553 U.S. 191 (2008).............................22

*Crookston v. Johnson,* 841 F.3d 396 (6th Cir. 2016) ..............................................9

*De La Fuente v Cortes,* 751 Fed Appx 269 (2018) .................................................20

*Elrod v. Burns,* 427 U.S. 347 (1976) ......................................................................32

*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280 (2005)...................17

*Gelineau v. Johnson*, 896 F. Supp.2d 680 (W.D. Mich. 2012) ...............................12

*Golden v. Gov't of the Virgin Islands* 2005 U.S. Dist LEXIS 45967 (D.V.I. Mar. 1, 2005) .......................................................................................................10

*Green Party of Tennessee v Hargett*, 767 F3d 533 (CA 6, 2014) ..........................29

*Hamilton's Bogarts, Inc. v. Michigan*, 501 F.3d 644 (6th Cir. 2007) .......................7

*Hunter v. Hamilton Cnty Bd of Elections*, 635 F.3d 219 (6th Cir. 2011)...............34

*In re De Lorean Motor Co.*, 755 F.2d 1223 (6th Cir. 1985)......................................7

*Jenness v. Fortson*, 403 US 431 (1971)..................................................................19

*Kendall Holdings, Ltd. v. Eden Cryogenics LLC,* 630 F. Supp.2d 853 (S.D. Ohio 2008)..........................................................................................................7

*Kennedy v Cascos,* 214 F Supp 3d 559 (WD Tex, 2016).......................................20

*Lawrence v. Welch*, 531 F.3d 364 (6th Cir. 2008)..................................................17

*Leary v. Daeschner,* 228 F.3d 729 (6th Cir. 2000).................................................7

*Libertarian Party of Michigan v Johnson*, 905 F Supp 2d 751 (ED Mich, 2012).........................................................................................................20

*Lucking v. Schram*, 117 F.2d 160 (6th Cir. 1941) ..................................................8

*Mable Cleary Trust v. Edward-Marlah Muzyl Trust*, 686 N.W.2d 770 (Mich. App. 2004).......................................................................................................14

*Miami Herald Pub Co v. Tornillo*, 418 U.S. 241 (1974)........................................28

*Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75 (1984).......................14

*Nader v. Land*, 433 F.3d 496 (6th Cir. 2006) ........................................................24

*Nken v. Holder,* 556 U.S. 418 (2009) .....................................................................33

*Norman v. Reed*, 502 U.S. 279 (1992)...................................................................22

*Ohio Republican Party v. Brunner,* 543 F.3d 357 (6th Cir. 2008)..........................8

*Purcell v. Gonzalez,* 549 U.S. 1 (2006) ..................................................................9

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 206 L.Ed.2d 452 (2020).........................................................................................................9

*Rosen v. Brown*, 970 F.2d 169 (6th Cir. 1992) .....................................................27

*Sandusky Cnty Democratic Party v. Blackwell,* 387 F.3d 565 (6th Cir. 2004).......34

*Serv. Employees Int'l Union Local 1 v. Husted,* 698 F.3d 341 (6th Cir. 2012) ........9

*Stein v. Cortes*, 223 F. Supp. 3d 423 (E.D. Penn, 2016) ........................................10

*Stenberg v. Cheker Oil Co.,* 573 F.2d 921 (6th Cir. 1978).........................................8

*Stern v Mascio*, 262 F.3d 600 (6th Cir. 2001) .........................................................14

*Storer v Brown*, 415 US 725 (1974) .........................................................................19

*Szymanski v. Dep't of Corrections*,  No. 350489, 2020 Mich. App. LEXIS
8752 (Mich. Ct. App., Dec. 29, 2020)...................................................................15

*Thompson v. Dewine*, 959 F.3d 804 (6th Cir. 2020)..................................................22

*Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997)..............................27

*Titan Ins Co v. Hyten*, 817 N.W.2d 562 (Mich. 2012) .............................................15

*United States v. Edward Rose & Sons*, 384 F.3d 258 (6th Cir. 2004)....................33

*W Virginia State Bd of Educ v. Barnette*, 319 U.S. 624 (1943) ..............................28

*Washington State Grange v Washington State Republican Party*, 552 US
442 (2008)..............................................................................................................28

*Washington v. Sinai Hosp of Greater Detroit*, 733 NW2d 755 (Mich. 2007) ........15

*William v. Rhodes*, 393 U.S. 23 (1968) .....................................................................9

*Williams v. Rhodes,* 393 U.S. 23 (1968) ...................................................................21

*Wooley v. Maynard*, 430 U.S. 705 (1977) ................................................................28

## Statutes

52 U.S.C. § 20302(a)(8)..............................................................................................30

Mich. Comp. Laws § 168.42.........................................................................................2

Mich. Comp. Laws § 168.648.......................................................................................5

Mich. Comp. Laws § 168.685..................................................................................2, 32

Mich. Comp. Laws § 168.686.......................................................................................2

Mich. Comp. Laws § 168.690.......................................................................................5

Mich. Comp. Laws § 168.713...................................................................................5, 12

Mich. Comp. Laws § 168.759a ...................................................................5

Mich. Comp. Laws § 168.685(6) ......................................................... 24, 32

Mich. Comp. Laws § 168.686a(4) ...........................................................18

Mich. Comp. Laws § 168.714 ..................................................................30

Mich. Comp. Laws §168.686 ...................................................................24

## Constitutional Provisions

Const, art 2, § 4 .......................................................................................5

Mich. Const. 1963, Art. II, § 4 ...........................................................5, 30

## CONCISE STATEMENT OF ISSUE PRESENTED

1.     Should Plaintiff's request for a temporary restraining order or preliminary injunction be denied because he has not demonstrated a likelihood of success on the merits of this constitutional claims or irreparable harm, and where the remaining injunction factors weigh in favor of the Defendant?

**INTRODUCTION**

Plaintiff Robert F. Kennedy, Jr. was nominated by the Michigan Natural Law Party in April 2024, as its candidate for President of the United States. Four months later, and on the eve of ballot certification and printing, Kennedy sought to withdraw as the party's candidate and have his name excluded from the November 5, 2024, general election ballot. The Michigan Supreme Court properly denied Kennedy relief. He now seeks a second bite at the apple in this Court. But Kennedy's request for an injunction should be denied for three reasons.

*First*, his request for injunctive relief is barred by laches. Kennedy unreasonably delayed filing suit in this Court until after the Secretary of State sent the slate of candidates to Michigan's 83 county clerks, which ultimately included Kennedy's name. The Secretary is or will be prejudiced by Kennedy's delay in requesting his removal from the ballot where a majority of counties have already commenced printing the millions of ballots required for the November election.

*Second*, Kennedy's First and Fourteenth Amendment claims are barred by res judicata. His First Amendment claim was decided on the merits by the state courts, and he could have brought his Fourteenth Amendment claim there as well. And where the parties in both cases are identical, res judicata applies.

And *third*, Kennedy's constitutional claims are without merit. Neither article II, § 1 of the U.S. Constitution nor the Supreme Court's decision in

1

*Anderson v. Celebrezze* render Michigan's law prohibiting Kennedy's withdrawal facially unconstitutional. And his First Amendment compelled speech claim fails where ballots are not mediums for speech. Finally, there is no equal protection violation where the statute does not severely burden Kennedy's rights and where the State's substantial interest in election administration outweigh any burden.

**STATEMENT OF FACTS**

**Michigan's filing requirements for minor party candidates.**

The Natural Law Party is a minor party entitled to ballot access in Michigan based on the number of votes its candidates have received in each election. Mich. Comp. Laws § 168.685. To field a candidate for President, the names, and addresses of the party's nominees for the offices of President and Vice-President must be certified by the chairperson and secretary of the party's state central committee to the Secretary of State within one business day after the conclusion of the party's state convention or national convention (whichever is later). Mich. Comp. Laws § 168.686. In addition, the party must timely send the names of its presidential electors to the Secretary. (*Id*.) *See also* Mich. Comp. Laws § 168.42.

**Kennedy is nominated by the Natural Law Party**

On April 17, 2024, the Natural Law Party held its state convention and nominated Kennedy as its candidate for President and Nicole Shanahan as Vice President. (Def's Ex. A, Certificate of Nomination.) The party nominated its

2

presidential electors the same day.  (Def's Ex. B, Certification of Presidential Electors.)

**Kennedy seeks to withdraw as a candidate for the Natural Law Party**

On Friday, August 23, 2024, Kennedy sent a letter to Director of Elections Jonathan Brater at 7:20 p.m. requesting that he be withdrawn as a candidate for the Natural Law Party.  (Def's Ex. C, email chain.)  The Bureau of Elections responded to the request on Monday, August 26, 2024, at 8:24 a.m., rejecting the withdrawal.  (*Id*.)  On August 27, 2024, at 4:31 p.m., Kennedy emailed Director Brater again requesting that he be withdrawn and disagreeing with the Bureau's reliance on Mich. Comp. Laws § 168.686a(4).  (*Id*.)  On August 29, 2024 at 7:24 a.m., the Bureau responded and denied this second request to withdraw. (*Id*.)

On Friday, August 30, 2024, after 5:00 p.m. and on the eve of the Labor Day holiday weekend, Kennedy filed suit in the Michigan Court of Claims seeking to have his name withdrawn from the ballot.  *Kennedy v. Benson*, Court of Claims No. 24-000138.  All state offices were closed on Monday, September 2, 2024.

On Tuesday, September 3, 2024, Director Brater received an email from Doug Dern, Chair of the Natural Law Party, opposing Kennedy's withdrawal as its candidate for President.  (Def's Ex. D, Brater Aff, Attachment A, Dern email.)

**The Court of Claims rules against Plaintiff keeping him on the ballot**

On September 3, 2024, at 2:40 p.m., the Michigan Court of Claims issued its decision denying Kennedy's complaint for mandamus, injunctive, and declaratory relief. (ECF No. 1-4. Compl., PageID.31, COC Decision.)

**The Court of Appeals reverses and removes Kennedy from the ballot**

Kennedy filed his appeal in the Michigan Court of Appeals after 10 p.m. on September 4, 2024. On September 6, 2024, shortly after Noon, the Court of Appeals reversed the Court of Claims, and ordered Kennedy be removed from the ballot. (Def's Ex. E, COA Decision.)

**The Michigan Supreme Court reverses and orders Kennedy back on the ballot**

A few hours later, the Secretary filed an emergency appeal in the Michigan Supreme Court requesting the Court reverse the Court of Appeals decision by 3:00 p.m. on Monday, September 9, 2024. Shortly after 2:30 p.m. on September 9, the Michigan Supreme Court issued its opinion granting the Secretary's application for leave to appeal and reversing the Court of Appeals, thus restoring Kennedy to the ballot. (ECF No. 1-6, PageID.37-57, MSC Decision.) The Michigan Supreme Court's order vacated the Court of Claims' opinion and order "except for that part of the Court of Claims order denying the motion for immediate mandamus relief and temporary restraining order/injunction and dismissing the complaint with prejudice, which we REINSTATE." (*Id.*, PageID.37, MSC Decision, p 1).

4

**The Secretary calls the election and confirms Kennedy is a candidate**

Under Mich. Comp. Laws § 168.648, the Secretary of State must send notices to the county clerks no later than 60 days prior to the election date, specifying the offices for which candidates are to be elected.  This year, 60 days before the November 5, 2024, general election fell on September 6.  And at 3:42 p.m. on Friday, September 6, 2024, the Secretary issued the call of the election, albeit without Kennedy's name as a candidate for President at the time.  (Def's Ex. D, Brater Aff, ¶ 15.)  On Monday, September 9, after the Supreme Court's decision, the Bureau of Elections advised the counties to proceed with Kennedy's name on the ballot.  (*Id*., ¶ 16.)

The county boards of election commissioners must deliver absent voter ballots to the county clerks at least 47 days before the general election, and this year that date is September 19, 2024.  Mich. Comp. Laws § 168.713.  The county clerks must, at least 45 days before the general election, deliver absent voter ballots to the local clerks.  Mich. Comp. Laws § 168.690.  The 45th day before the general election is also the day by which absent voter ballots must be available for delivery to military and overseas voters.  Mich. Comp. Laws § 168.759a; Mich. Const. 1963, Art. II, § 4; 52 U.S.C. § 20302.  This year, the 45th day before the general election is September 21, 2024.  Given these requirements and the tight timeline, in order for absent voter ballots to be timely delivered and made available, the ballot

printing process commenced forthwith after the Secretary's notice on September 6. (Def's Ex. D, Brater Aff, ¶ 15.)

### Plaintiff files suit in this Court a day later and after hours

Minutes after the Supreme Court's ruling on Monday, September 9, Kennedy's counsel advised that they intended to file in federal court seeking immediate relief. (Def's Ex. F, Brehm email.) Yet, no action was filed during or after the close of business on September 9. The next day, September 10, 2024, Kennedy's counsel emailed at 1:44 p.m. indicating he would be filing a complaint and ex parte motion for temporary restraining order that "afternoon." (Def's Ex. G, DeBus email chain.) Counsel indicated he would provide courtesy copies of all filings. (*Id*.) But no action was filed by the close of business on September 10, 2024, and no courtesy copies were provided to the undersigned counsel. Shortly after 10:00 a.m. on Wednesday, September 11, Kennedy's counsel emailed the undersigned counsel attaching copies of the filed documents. (*Id*.) Given the time sensitivities, the undersigned counsel accepted service for the Secretary and filed appearances.

## ARGUMENT

**I.    Plaintiff's request for an injunction should be denied where he has not satisfied any of the factors necessary for granting such relief.**

### A.    Temporary or preliminary injunction factors

Like a preliminary injunction, a temporary restraining order is an extraordinary remedy "designed to preserve the relative positions of the parties until a trial on the merits can be held." *Cf. Tennessee Scrap Recyclers Ass'n v. Bredesen,* 556 F.3d 442, 447 (6th Cir. 2009). A court considers "four factors when determining whether to grant a temporary restraining order: '(1) whether the movant has a "strong" likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of [a TRO] would cause substantial harm to others; and (4) whether the public interest would be served by issuance of [a TRO].' " *Kendall Holdings, Ltd. v. Eden Cryogenics LLC,* 630 F. Supp.2d 853, 860 (S.D. Ohio 2008) (quoting *Leary v. Daeschner,* 228 F.3d 729, 736 (6th Cir. 2000)).

No one factor is dispositive; rather the court must balance all four factors. *In re De Lorean Motor Co.,* 755 F.2d 1223, 1229 (6th Cir. 1985). But in First Amendment cases, "the crucial inquiry is usually whether the plaintiff has demonstrated a likelihood of success on the merits." *Hamilton's Bogarts, Inc. v. Michigan*, 501 F.3d 644, 649 (6th Cir. 2007) (internal citations and quotations omitted). This is because the public's interest and any potential harm to the parties

or others "largely depend on the constitutionality of the [state action]." *Id.  See e.g. Ohio Republican Party v. Brunner,* 543 F.3d 357, 361 (6th Cir. 2008).

The burden of persuasion is on the party seeking the injunctive relief. *Stenberg v. Cheker Oil Co.,* 573 F.2d 921, 925 (6th Cir. 1978).

### B.    Plaintiff has no likelihood of succeeding on the merits

The Sixth Circuit has long held that in determining whether to grant an injunction, the movant must show a "strong likelihood of success on the merits." *Ohio Republican Party,* 543 F.3d at 361.

### 1.    Plaintiff's claims are barred by laches

Laches bars Kennedy's request for injunctive relief.  The defense of laches is rooted in the principle that "equity aids the vigilant, not those who slumber on their rights." *Lucking v. Schram*, 117 F.2d 160 (6th Cir. 1941).  An action may be barred by laches if: (1) the plaintiff delayed unreasonably in asserting his rights and (2) the defendant is prejudiced by this delay.  *Brown-Graves Co. v. Central States, Southeast and Southwest Areas Pension Fund*, 206 F.3d 680, 684 (6th Cir. 2000).  Laches applies in this case because both factors are met.

Kennedy unreasonably delayed raising his claims before this Court, and the Secretary of State—indeed, election officials throughout the state—have been prejudiced by his delay.

It is well-established that eleventh-hour requests for injunctions on the eve an election are disfavored.  "As a general rule, last-minute injunctions changing election procedures are strongly disfavored."  *Serv. Employees Int'l Union Local 1 v. Husted,* 698 F.3d 341, 345 (6th Cir. 2012) (citing *Purcell v. Gonzalez,* 549 U.S. 1, 4-5 (2006) ("Court orders affecting elections…can themselves result in voter confusion…As an election draws closer, that risk will increase.")); *William v. Rhodes*, 393 U.S. 23, 34-35 (1968) (affirming denial of request for injunction requiring last-minute changes to ballots, given risk of disrupting election process). The Supreme Court reaffirmed that principle in *Republican Nat'l Comm. v. Democratic Nat'l Comm*., 589 U.S. 423 (2020) (staying portions of an injunction modifying process for mailing ballots on eve of primary election).  The Sixth Circuit has also recognized that the federal courts should not quickly "become entangled, as overseers and micromanagers, in the minutiae of state election processes."  *See Ohio Democratic Party v. Husted*, 834 F.3d 620, 622 (6th Cir. 2016); *Crookston v. Johnson,* 841 F.3d 396, 398 (6th Cir. 2016) ("Call it what you will—laches, the *Purcell* principle, or common sense—the idea is that courts will not disrupt imminent elections absent a powerful reason for doing so.")

But Kennedy's claims for injunctive relief here are not just last-minute—they are after the fact.  The ballots have already gone to print in at least 45

counties.  (Def's Ex. D, Brater Affidavit, ¶25).  Consequently, the rationale for laches is even more compelling.

Kennedy's delay in coming to this Court is simply unreasonable.  *See Stein v. Cortes*, 223 F. Supp. 3d 423, 437 (E.D. Penn, 2016) (holding that "prejudicial and unnecessary delay alone provides ample ground" to deny emergency injunctive relief); *see also Golden v. Gov't of the Virgin Islands* 2005 U.S. Dist LEXIS 45967, *15-17 (D.V.I. Mar. 1, 2005)(holding that plaintiffs lacked diligence by waiting to see whether their candidate of choice won, and that the doctrine of laches bars post-election "sand-bagging on the part of wily plaintiffs.")

As detailed above, Kennedy did not seek to withdraw his candidacy until August 23, 2024, did not file in state court until August 30, 2024, and did not file this action until after fully litigating his claims in state court.  There was no reason Kennedy could not have filed this federal action earlier.  While his decision to withdraw at all should have been made weeks or even months earlier, this lawsuit should have been filed at least no later than the filing of his action in the Michigan Court of Claims on August 30.  Kennedy could have filed parallel actions, with his state law claims filed in Michigan courts and any federal claims presented to this Court.  Instead, he opted to pursue only his claims in state court.  That was his choice, but his decision to litigate in state court does not excuse his delay in seeking relief from this Court.

Worse still, even after the Michigan Supreme Court decision, Kennedy was once again slow to take action.  The Michigan Supreme Court decision was issued just before 3 p.m. on Monday, September 9.  Kennedy did not file the complaint in this Court until later in the evening on Tuesday, September 10—well after the clerk's office closed.  He did not serve the Secretary of State or provide any copies of his filings until 10:30 a.m. on Wednesday, September 11.

Kennedy's complaint is only 50 paragraphs long and consists of claims and arguments recycled from arguments previously made to the state courts, and so there is no reason it could not have been drafted and filed late Monday.  Instead, Kennedy delayed an entire day and failed to initiate this case in time to get a summons and serve the Secretary until Wednesday.  This kind of delay is both unjustifiable and baffling—especially where Kennedy should have been aware from the repeated statements by the Secretary in the state courts that the ballot printing process needed to begin immediately after September 6.  The undersigned counsel also advised counsel for Kennedy on the afternoon of September 10 that Wayne and Oakland Counties had already gone to print.  (Def's Ex. G, DeBus email chain.)  Kennedy admits that he knew that the call of the election was issued on Friday, September 6 and that the Secretary did not order clerks to hold the printing of ballots.  (ECF No 1, Compl., PageID.6, ¶13.)

The Secretary, and more specifically the 83 county clerks and myriad city and township clerks she supervises, are prejudiced by Kennedy's delay. As affirmed by Director Brater, at least 45 counties have already sent their ballots to print. (Def's Ex. D, Brater Aff, ¶ 25.) Included in that group are Wayne and Oakland Counties—the two most populous counties in the state. The relief Kennedy seeks would require all ballots to be reprinted, at considerable expense. The printer contracted to print ballots for Wayne County avers that the cost to print ballots for just that one county is nearly $500,000. (*Id*., Brater Aff, Attachment B, Thompson Aff, ¶11). Further, even if ballot reprinting were ordered, such relief at this time risks the counties being unable to finish their work in time to complete printing and deliver absent voter ballots to local jurisdictions by September 19. (*Id.*, Brater Aff, ¶ 24.) *See* Mich. Comp. Laws § 168.713. It also jeopardizes their ability to deliver ballots to military and overseas voters by September 21, as required by state and federal law. (*Id*., ¶¶ 22-24.)

The Western District Court previously denied injunctive relief under strikingly similar circumstances. In *Gelineau v. Johnson*, the court rejected a request for injunctive relief based on laches where the plaintiff minor party candidate filed suit "just days" before the printing process was to commence. 896 F. Supp.2d 680, 683-86 (W.D. Mich. 2012). The court observed that the "prejudice to the Secretary" was "abundantly clear." *Gelineau*, 896 F. Supp.2d at

683.  The court recounted the complex, ballot printing process—the same as that described in Director Brater's affidavit—and the then Secretary's concern that deadlines related to absent voter ballots could not be met in the event of a printing delay—a concern echoed in Director Brater's affidavit.  *Id*.  The court recognized the State's interest in an orderly process:  "The Secretary is tasked with administering Michigan's elections, and both state and federal laws acknowledge the time-sensitive nature of this process. The Secretary—and by extension the people of Michigan—have a strong interest in managing the election process in an orderly manner."  *Id*.  The court went on to conclude that the plaintiffs had unreasonably delayed in bringing their claims*,* which, like here, included some "unorthodox maneuver[ing]" and denied relief based on laches.  *Id*. at 684-86.

Here, Kennedy could have filed this action weeks ago but chose to litigate in state court instead.  Only after losing there did he decide to initiate this action, and well after the call of the election and ballot printing began.  Kennedy's delay is unreasonable, and the Secretary of State and the clerks she supervises will be severely prejudiced by any grant of relief in this case.

## 2.    Plaintiff's claims are barred by the doctrine of res judicata

As another threshold matter, Kennedy's substantive claims are barred by res judicata.  Res judicata precludes not only relitigating a previously adjudicated claim but also litigating a claim or defense that should have been raised, but was

13

not, in a prior suit. *Stern v. Mascio*, 262 F.3d 600, 608 (6th Cir. 2001). The

preclusive effect of a state court judgment is determined by that state's law. *Migra*

*v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984). In Michigan, res

judicata "bars a second, subsequent action when (1) the prior action was decided

on the merits, (2) both actions involve the same parties or their privies, and (3) the

matter in the second case was or could have been resolved in the first." *Adair v.*

*State Dept. of Ed.*, 680 N.W.2d 386, 396 (2004). Each of these elements is present.

First, Kennedy's earlier state court case was decided on the merits. Kennedy

alleged that his First Amendment rights were violated by prohibiting his

withdrawal as a presidential candidate after being nominated by a minor party.

That claim was rejected by the Michigan Court of Claims. (ECF No. 1-4. Compl.,

PageID.31, COC Decision, p 4.) The court thus considered Kennedy's speech

claim and determined that it lacked merit. The Michigan Supreme Court's later

order reinstated that Court of Claims' order insofar as it dismissed the complaint

with prejudice. (ECF No. 1-6, PageID.37-57, MSC Decision.) Kennedy's state

court complaint—and all of his claims—were thus dismissed with prejudice. This

was a dismissal on the merits, in the nature of a grant of summary disposition

under MCR 2.116. *See Mable Cleary Trust v. Edward-Marlah Muzyl Trust*, 686

N.W.2d 770, 787 (Mich. App. 2004) ("[A] summary disposition ruling is the

procedural equivalent of a trial on the merits that bars relitigation on principles of

14

res judicata."), overruled in part on other grounds *Titan Ins Co v. Hyten*, 817

N.W.2d 562, 568 n 4 (Mich. 2012); *see also Szymanski v. Dep't of*

*Corrections*,  No. 350489, 2020 Mich. App. LEXIS 8752, at *5 (Mich. Ct. App.,

Dec. 29, 2020)(per curiam)(holding that res judicata bars a second action based

upon matters "that the court passed upon" in rejecting the same arguments raised in

earlier complaint for mandamus).

Second, this new case involves the same parties as the earlier lawsuit.

Plaintiff Kennedy was the plaintiff in the state case.  And Secretary Benson—the

Defendant in this case was the defendant in the prior action.

Third, the claims Kennedy raises here either were raised before, or they

could have been raised and resolved in Kennedy's first lawsuit.  Michigan uses "a

transactional test to determine if the matter could have been resolved in the first

case."  *Washington v. Sinai Hosp of Greater Detroit*, 733 NW2d 755, 760 (Mich.

2007). "The 'transactional' test provides that the assertion of different kinds or

theories of relief still constitutes a single cause of action if a single group of

operative facts give rise to the assertion of relief." *Id.* (quotation marks and citation

omitted).  Further, " '[w]hether a factual grouping constitutes a transaction for

purposes of res judicata is to be determined pragmatically, by considering whether

the facts are related in time, space, origin or motivation, [and] whether they form a

convenient trial unit[.]' " *Adair v. State*, 680 N.W.2d 386, 398 (Mich.

2004) (citation omitted.)  As a result, any other claims Kennedy *could* have raised

based upon the same group of operative facts are also barred by res judicata.

 The claims in this lawsuit are all based entirely on the same set of facts:

Kennedy's attempt to withdraw as a presidential candidate, and the Secretary of

State's rejection of his untimely request as contrary to state law.  To start,

Kennedy's Count III—alleging "compelled speech"—is virtually identical to a

claim he actually raised in the state court.  (Def's Ex. H, Kennedy Compl.)  That

claim was rejected by the Court of Claims, which decision the Michigan Supreme

Court reinstated to the extent that it dismissed Kennedy's claims "with prejudice."

That claim clearly was raised and dismissed by the state courts.

 But also, Count I is based on Kennedy's interpretation of the *Anderson v.*

*Celebrezze* decision, but he presented a similar argument to the Michigan Supreme

Court in his brief.  (Def's Ex. I, Kennedy MSC Brief, p 10-11).  Kennedy's equal

protection claim in Count II was also echoed in his Michigan Supreme Court brief,

where he compared his attempt to withdraw with President Biden.  (*Id.*)  These

arguments were necessarily rejected by the Michigan Supreme Court when it

reinstated the dismissal of Kennedy's complaint.

 But regardless, even if the claims were not decided below, they are clearly

claims that *could* have been brought in the earlier action.  Kennedy had all the

same facts—and essentially the same legal arguments—in the earlier state case that

he presents to this Court now.  These claims all satisfy the transaction test under Michigan law, and so they are also barred by res judicata.[1]

### 3.    Plaintiff's article II, § 1 claim is without merit

Turning to the merits, in Count I, Kennedy appears to allege a violation of article II, § 1 of the U.S. Constitution based on the Supreme Court's decision in *Anderson v. Celebrezze*, 460 U.S. 780 (1983).  (ECF No. 1, Compl., PageID.6-11.)

Article II, § 1 of the Constitution delegates authority to the states to regulate the selection of Presidential electors.  U.S. Const., Art. II, § 1.  In *Anderson,* the Court struck down Ohio's early filing deadline for independent presidential candidates.  *Anderson*, 460 U.S. at 793 ("A burden that falls unequally on new or small political parties or on independent candidates impinges, by its very nature, on associational choices protected by the First Amendment.")  In *Anderson* the candidate had been *denied* ballot access.

The Court observed that "in the context of a Presidential election, state-imposed restrictions implicate a uniquely important national interest. For the President and the Vice President of the United States are the only elected officials

---

[1] Kennedy's complaint does not appear to allege any injury *caused by* the Michigan Supreme Court's rejection of his claims, and so the Defendant is not raising the *Rooker-Feldman* doctrine at this time.  However, it is worth brief mention that any review of the state supreme court's decision is reserved for the United States Supreme Court. *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp*., 544 U.S. 280, 291 (2005); *Lawrence v. Welch*, 531 F.3d 364, 368 (6th Cir. 2008).

who represent all the voters in the Nation." *Id.* at 794-95 (footnotes omitted).

Further, "the impact of the votes cast in each State is affected by the votes cast for

the various candidates in other States.  Thus, in a Presidential election a State's

enforcement of more stringent ballot access requirements, including filing

deadlines, has an impact beyond its own borders." *Id*. at 795 (footnotes omitted).

As a result, "[t]he State has a less important interest in regulating Presidential

elections than statewide or local elections, because the outcome of the former will

be largely determined by voters beyond the State's boundaries." *Id.*

Here, Kennedy obtained ballot access and instead seeks to renege on his

nomination.  Michigan, pursuant to statute, sought to preserve the presidential

ballot.  The decision in *Anderson*, standing alone, does not compel a conclusion

that Michigan's statute is unconstitutional.  Indeed, Kennedy reads *Anderson* too

broadly by suggesting that Michigan's statute, Mich. Comp. Laws § 168.686a(4),

fails outright.  *Anderson* was not a wholesale rejection of any and all presidential

filing requirements under state law, and the Supreme Court recognized that "'as a

practical matter, there must be a substantial regulation of elections if they are to be

fair and honest and if some sort of order, rather than chaos, is to accompany the

democratic processes.'"  460 U.S. at 788 (citations omitted).

Further, Kennedy's suggestion that *Anderson* prevents any state regulation

of presidential elections overlooks a body of federal caselaw upholding "sore

18

loser" laws prohibiting failed primary candidates from running as independents in the same election.  Most notably, the Supreme Court upheld such laws in *Storer v. Brown*, noting "a State has an interest, if not a duty, to protect the integrity of its political processes from frivolous or fraudulent candidacies."  415 U.S. 725, 735 (1974) (citation omitted.)  The *Storer* Court also approved of party disaffiliation requirements for independent candidacies: "The requirement that the independent candidate not have been affiliated with a political party for a year before the primary is expressive of a general state policy aimed at maintaining the integrity of the various routes to the ballot."  *Storer*, 415 U.S. at 733.  The Court held that disaffiliation "furthers the state's interest in the stability of its political system." *Id.* at 736.  The act of disaffiliation is effectively a "withdrawal" from a political party, and so has clear parallels to the case at hand.

Notably, the Supreme Court also upheld the importance of primaries.  "The State's general policy is to have contending forces within the party employ the primary campaign and primary election to finally settle their differences. *The general election ballot is reserved for major struggles; it is not a forum for continuing intraparty feuds.*"  *Id.* at 735 (emphasis added).  The same rationale applies equally to state conventions, and the State's general election ballot is also not a forum for intraparty—or individual—divergences.

19

Various courts have followed *Storer* in upholding disaffiliation statutes. *See, e.g., De La Fuente v. Cortes,* 751 Fed. Appx. 269, 273-274 (3rd Cir. 2018). Similarly, in *Kennedy v. Cascos,* the district court relied on *Storer* to uphold Texas' "sore loser" law.  214 F. Supp. 3d 559, 563 (W.D. Tex., 2016).  In so holding, the court rejected an argument similar to that raised by Kennedy here; that under *Anderson*, states have "less important" interests in presidential elections.  *Id.* ("Indeed, *Anderson* recognized that states have important and legitimate interests in voter education and the prevention of excessive factionalism, though they may be less able to advance them in the context of a national election.") (internal citation omitted).

Further, and closer to home, in *Libertarian Party of Michigan v. Johnson*, the court held Michigan's sore loser law applies to presidential candidates, and is constitutional where it is "directed expressly at preventing last minute political party maneuvering, is a reasonable, nondiscriminatory restriction justified by Michigan's important regulatory interests of preventing extended intra party feuding, factionalism and voter confusion." 905 F. Supp. 2d 751, 766 (E.D. Mich., 2012).  Again, the same rationale that upholds "sore loser" laws applies with equal measure for the restriction against withdrawal after a candidate has been nominated.

20

Thus, Michigan's statute prohibiting Kennedy's withdrawal is not inherently unconstitutional, but rather must be analyzed under the traditional balancing test just like the Ohio law in *Anderson*.  460 U.S. at 789.

### 4. Plaintiff's Fourteenth Amendment claim is without merit

In Count II, Kennedy alleges a violation of his Fourteenth Amendment right to equal protection where he, as a minor party candidate, was not permitted to withdraw, but President Biden, as a major party candidate, was permitted to withdraw.  (ECF No. 1, Compl., PageID.11-15.)

"[T]he right to vote in any manner and the right to associate for political purposes through the ballot [are not] absolute," and "States retain the power to regulate their own elections."  *Burdick v. Takushi*, 504 U.S. 428, 433 (1992). ) Candidate qualification statutes nevertheless implicate " 'the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively.' "  *Anderson,* 460 U.S. at 786-87 (quoting *Williams v. Rhodes,* 393 U.S. 23, 30-31 (1968)).  The associational rights of candidates—as well as their parties and their supporters— are protected by the First and Fourteenth Amendments.  *Id.*

The *Anderson-Burdick* analysis governs First and Fourteenth Amendment challenges to ballot regulations. *See Anderson*, 460 U.S. 780; *Burdick*, 504 U.S. at 441. Under that framework, when state law imposes " 'severe' restrictions," "the

regulation must be 'narrowly drawn to advance a state interest of compelling importance.' " *Burdick*, 504 U.S. at 434. (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)).  But when state law imposes "reasonable, nondiscriminatory restrictions," the law is subject to rational-basis review and "the State's important regulatory interests are generally sufficient to justify" the restrictions. *Id.* (quoting *Anderson*, 460 U.S. at 788). When state law imposes a burden that falls somewhere in between, the courts "weigh the burden imposed by the State's regulation against 'the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights.' " *Thompson v. Dewine*, 959 F.3d 804, 808 (6th Cir. 2020) (per curiam) (quoting *Burdick*, 504 U.S. at 434).

### a.   Plaintiff's rights are not severely burdened.

While the Supreme Court has not identified any litmus-test for measuring the burden imposed by an election regulation, *see Crawford v. Marion County Election Bd,* 553 U.S. 191 (2008), prohibiting a minor party candidate from withdrawing *once nominated* is not a "severe" burden in any sense.  In Michigan, minor party candidates may withdraw from consideration at any point until their party's convention and their nomination.  But once nominated, a candidate bears the flag of their party, and their interests as a candidate are no longer exclusively their own.  Still, while a candidate may not be removed from the ballot after their

nomination, a candidate is not required to actively campaign or to make any minimum of effort to be elected.  In short, Kennedy is not obligated to do anything at all for the remainder of this election cycle.  If this is a burden at all, it cannot be considered "severe," and is readily justified by the state's regulatory interests, as discussed further in Argument I.B.3.b below, and by balancing the interests of minor parties and their supporters.

Kennedy argues that Michigan's deadline for presidential candidates to withdraw gives major party candidates a "greater opportunity to withdraw as a candidate—as President Biden did."  (ECF No. 2, TRO Brief, PageID.74.) Kennedy thus claims a disparity between the ability of major party candidates to withdraw and his own ability as a minor party nominee.  But this claimed burden is not "severe"—or even existent.

Kennedy's argument fails to acknowledge—let alone distinguish—that President Biden's "withdrawal" occurred in July, and well before either the Democratic National Convention held between August 19 and August 22 or the Michigan Democratic Party's convention on August 24.  Further, the Michigan Democratic Party did not submit its nominations to the Secretary until August 26, 2024.  Mich. Comp. Laws § 168.686.  Simply put, no major party candidates have been permitted to withdraw after being nominated, either.

Next, Kennedy's claim that major party candidates have a "greater opportunity" to withdraw is misplaced. Kennedy argues that Michigan law does not prohibit presidential nominees of major parties from withdrawing, but he also points to no section that *permits* that to happen. Instead, the Secretary of State is <u>required</u> to certify the candidates named by the state party chairperson and secretary. *Nader v. Land*, 433 F.3d 496, 498 (6th Cir. 2006) (citing Mich. Comp. Laws §168.686). In the absence of any statutory authorization to accept a withdrawal, the Secretary is required to recognize the party's nomination.

Consequently, Kennedy was not treated any differently as a minor party nominee, and there is no additional burden imposed upon him, let alone a "severe" one. Rather, the proscription against withdrawing after nomination is a reasonable, non-discriminatory restriction that is subject only to rational basis review, and the state's regulatory interests in an orderly election readily satisfy that threshold.

### b.    The State's interest in prohibiting the withdrawal of candidates is substantial.

Michigan has considerable interests in regulating when candidates withdraw. First, Michigan law provides that minor parties who fail to win a minimum number of votes lose their right to appear on the ballot as a political party. Under Mich. Comp. Laws § 168.685(6), if a party's principal candidate does not achieve a minimum number of votes, the party will no longer be entitled to have the name of

any candidate printed on the next general election ballot, and it would have to re-qualify as a state political party.

This is how Michigan determines which political parties have enough support to have their candidates appear on the ballot. But, if candidates, like Kennedy, were permitted to withdraw after accepting a nomination, it would leave their party—here the Natural Law Party—without a leading candidate at the top of the ballot. The party would then be at risk of losing its place on the ballot as a result of one candidate's belated decision to withdraw. In his e-mail to Director Brater, Natural Law Party Chair Doug Dern stated that his party would be "greatly harmed if not destroyed if this were allowed." (Def's Ex. D, Brater Affidavit, Attachment A, Dern e-mail). Such withdrawals jeopardize not only the party's interests, but the state's interest in the orderly administration of elections and its regulatory process of determining which parties have enough continued support to support ballot access.

Moreover, Michigan has an interest in recognizing the First Amendment associational rights of minor parties in its State and ensuring that party members be allowed to reflect their support for their party and its nominees. *See, e.g. Anderson*, 460 U.S. at 793-94. Again, once a candidate accepts their party's nomination, they are no longer merely individuals with only a personal stake in the election. In agreeing to be a nominee, they become the representative of their

party and accept some minimal obligation to see the election through as the party's candidate.  No candidate is compelled to accept a nomination but, once that nomination is accepted, they must honor their agreement until the election is over.

### 5.    Plaintiff's First Amendment claim is without merit.

Finally, in Count III, Kennedy alleges that by not permitting him to withdraw his candidacy the Secretary violated his First Amendment rights under a compelled speech theory.  (ECF No. 1, Compl., PageID.15-19.)  But this claim fails where no speech is at issue, let alone burdened, and where Michigan's important regulatory interests support application of its statute.

### a.    Plaintiff's rights are not severely burdened.

Kennedy asserts that placing his name on the ballot is tantamount to "compelling [him] to convey a false message to every citizen of Michigan that he is vying for their vote in this state."  (ECF No. 1, Compl., PageID.16.)  In other words, Kennedy seeks to characterize election ballots as a medium of communication, and he asserts that he is being forced to use this medium of communication.

For Kennedy to have an intelligible claim under the First Amendment, he must first establish that when his name appears on a ballot, the ballot is his speech. Here, Kennedy fails to demonstrate that he is producing speech on or through the ballot.  No court has ever held that election ballots are a medium of

communication. Therefore, placing Kennedy's name on the ballot cannot constitute candidate speech. There are two reasons this is true.

First, merely placing a candidate's name on the ballot is not speech at all. The Supreme Court has consistently held that ballots are not forums for candidate speech. *See*, *e.g.*, *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 363 (1997) ("Ballots serve primarily to elect candidates, not as forums for political expression.").

Political parties can use their speech rights to clarify in other available mediums of communication like television, newspapers, and their campaign websites. As the Court has explained, political parties "retain[] great latitude in [their] ability to communicate ideas to voters and candidates through [their] participation in the campaign[.]" *Timmons*, 520 U.S. at 363; *see also Rosen v. Brown*, 970 F.2d 169, 175 (6th Cir. 1992) (holding that states do not have to provide ballots with political designations of candidates). But the ballot is not the medium through which Kennedy or any other candidate sends messages to voters.

Second, Kennedy's compelled speech claim does not conform to any of the types of compelled speech previously recognized by the Court. There are many ways in which speech can attributed to an individual. But Kennedy has failed to demonstrate that any of them apply. For example, Kennedy does not speak or write the ballot himself, which is the most common form of speech. *See, e.g., W*

*Virginia State Bd of Educ v. Barnette*, 319 U.S. 624, 642 (1943) (holding that a policy requiring students to recite the Pledge of Allegiance is compelled speech). Moreover, Kennedy does not publish the ballot himself, another form of speech. *See Miami Herald Pub Co v. Tornillo*, 418 U.S. 241, 241 (1974) (holding that a statute requiring newspapers to publish the replies of political candidates whom they had criticized is compelled speech). And Kennedy is not being asked to display the ballot on his private property, yet another form of speech. *See Wooley v. Maynard*, 430 U.S. 705, 705–706 (1977) (holding that a state requirement to display the state motto on every car's license plate is compelled speech). These types of communication—first-person speech, publication of speech in one's own newspaper, and displaying a message on one's own property—are the prototypical types of speech that cannot be compelled. But a ballot is not one of them.

Further, Kennedy's allegation that placing his name on the ballot constitutes compelled speech is without precedent. Indeed, to the Secretary's knowledge, there are only two Supreme Court opinions that consider compelled speech claims in connection with ballot regulations. In both decisions, the Court decided not to apply the compelled speech doctrine to ballot regulations. *See Cook v. Gralike*, 531 U.S. 510, 531 (2001) and *Washington State Grange v. Washington State Republican* Party, 552 U.S. 442, 444 (2008). There is also no applicable precedent

from the Sixth Circuit Court of Appeals.  Applying the compelled speech doctrine to Kennedy's challenge is thus without precedent.

But breaking new ground is unnecessary because Kennedy is challenging a law that regulates state electoral processes, not speech.  As stated above, when reviewing statutes regulating election processes, courts apply the *Anderson-Burdick* framework.  *Green Party of Tennessee v. Hargett*, 767 F.3d 533, 545 (6th Cir., 2014).

As to the first step of the analysis, there is no burden to Kennedy's First Amendment rights because his speech is not at issue.  The *Anderson-Burdick* analysis should thus end there.

### b.    The State's interest in prohibiting withdrawal is substantial

But if the *Anderson-Burdick* analysis were to continue, Michigan has two justifications for enforcing the election law: (1) protecting the integrity of election administration, which is particularly vulnerable here given that ballots have already begun printing, and (2) protecting the minor party rights of Kennedy's nominating party and its supporters.  Given the strength of these interests, Michigan's law is constitutionally valid.

As to the first interest, the integrity of the electoral process is at stake. Michigan has enacted ballot printing deadlines for the purpose of complying with state and federal law and protecting the voting rights of military and overseas

voters. *See* 52 U.S.C. § 20302(a)(8), Mich. Const. 1963, Art. II, § 4, and Mich.

Comp. Laws §§ 168.714 and 759a.  Kennedy's last-minute maneuver would halt

and reverse the ballot-printing process.  But the Michigan Election Law makes no

exception for a candidate's political maneuvers, nor does the Supreme Court.  *See,*

*e.g., Burdick*, 504 U.S. at 440 (1992) ("The State has a legitimate interest in

preventing these sorts of maneuvers [by candidates]").

Kennedy's change of heart does not outweigh the right of military and

overseas voters to receive their ballots on time. Kennedy may claim that placing

his name on the ballot will "mislead voters" about his intention to run.  (ECF No.

1, PageID.19.)  But that claim is at odds with Kennedy's own public statements.  In

his official announcement of his campaign's suspension, he clearly states that he

will intentionally remain on the ballot in most states and encourages voters in "blue

states" to vote for him despite his decision to endorse another candidate.[2]  He even

holds out hope that he might still win the presidency by remaining on the ballot in

those states and forcing a contingent election.  *Id.*  As of September 11, 2024,

Kennedy is on the ballot in 20 states, not on the ballot in 16 states, and his status is

---

[2] Robert F. Kennedy, Jr., *Why I Am Suspending My Campaign for President*,
Substack (Aug. 23, 2024), https://robertfkennedyjr.substack.com/p/why-i-am-
suspending-my-campaign-for ("I want everyone to know that I am only suspending
my campaign, not terminating it. My name will still be on the ballot in most states.
If you live in a blue state, you can vote for me without harming or helping
President Trump or Vice President Harris.").

waiting official confirmation in 13 states plus Washington, D.C.[3]  In at least two states, Kennedy even submitted petitions to qualify for ballot access after suspending his campaign on August 23: Kentucky and Oregon.[4]

Kennedy says one thing in Michigan and another thing in Kentucky and Oregon. And his attempt to have his cake and eat it too is what would "upend election and ballot integrity."  (ECF No. 1, Compl., PageID.19.)

As to the state's second interest, any free speech analysis must also consider the associational rights of the supporters of Kennedy's nominating party, the Natural Law Party.  In *Anderson*, the Supreme Court based its holding on the voting and associational rights of *supporters* of independent candidates.  *Anderson*, 460 U.S. at 793–94.   Kennedy sought out, and won, the nomination of Michigan's Natural Law Party.[5]   To grant Kennedy's request would leave this party and its

---

[3] Caitlin Yilek, Map shows where RFK Jr. is on the ballot in the 2024 election, CBS News (Sept. 11, 2024), https://www.cbsnews.com/news/rfk-jr-map-on-the-ballot-states/.

[4] McKenna Horsley, After suspending his campaign, Robert F. Kennedy Jr. filed to run for president in Kentucky, Kentucky Lantern, (Aug. 27, 2024), https://kentuckylantern.com/briefs/after-suspending-his-campaign-robert-f-kennedy-jr-filed-to-run-for-president-in-kentucky/;  Dirk VanderHart, RFK Jr. supporters put him on Oregon ballot, despite suspended campaign, Oregon Public Broadcasting  (Aug. 27, 2024), https://www.opb.org/article/2024/08/27/rfk-robert-f-kennedy-jr-supporters-oregon-ballot-despite-suspended-campaign/.

[5] Robert F. Kennedy Jr. gets spot on Michigan's ballot as Natural Law Party nominee, https://www.detroitnews.com/story/news/politics/2024/04/18/robert-f-kennedy-jr-rfk-gets-spot-on-michigan-presidential-ballot-as-natural-law-party-nominee/73370615007/ (accessed September 12, 2024.)

supporters without a nominee on the ballot at no fault of their own. (Def's Ex. D, Brater Aff, Attachment A, Dern email.) There may be supporters of the Natural Law Party who wish to vote for their party's nominee to meet the vote threshold to ensure the party's continued presence in future elections. *See* Mich. Comp. Laws § 168.685(6).

For these reasons, Kennedy's compelled speech claim should be rejected.

### C. Plaintiff has not demonstrated irreparable harm

In considering an injunction, courts must assess whether the plaintiff will suffer irreparable injury absent an injunction. *Certified Restoration Dry Cleaning Network v. Tenke Corp.,* 511 F.3d 535, 550 (6th Cir. 2007). Irreparable harm may exist where a plaintiff can demonstrate a substantial likelihood of success on the merits of the plaintiff's claim that his constitutional right has or will imminently be violated. *Elrod v. Burns,* 427 U.S. 347, 373-74 (1976).

The only irreparable harm Kennedy claims is injury to his constitutional rights. (ECF No. 2, TRO Brf, PageID.80.) But for the reasons discussed above, Kennedy has not demonstrated that Michigan's statutory prohibition on withdrawing his candidacy for President poses imminent harm to Kennedy where he fails to demonstrate a substantial likelihood of success on the merits of his claims that the statute violates his constitutional rights. *Elrod,* 427 U.S. at 373-74.

Thus, Kennedy has not demonstrated that he will suffer irreparable injury absent an injunction.

### D. The balance of harms and the public interest weigh against granting the injunction

Here, the balance of harms and public interest factors weigh in Defendant's favor. These factors "merge when the Government is the opposing party." *Nken v. Holder,* 556 U.S. 418, 435 (2009).

While there will be no irreparable harm to Kennedy without an injunction, an injunction will irreparably harm the State and its voters. Generally, the purpose of an injunction is to preserve the status quo. *United States v. Edward Rose & Sons*, 384 F.3d 258, 261 (6th Cir. 2004). But here Kennedy seeks to upend the status quo. As noted above, the Supreme Court has repeatedly warned courts against changing state election rules close to an election. *See, e.g.*, *Republican Nat'l Comm.*, 589 U.S. at 424 ("This Court has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election.").

The election law challenged here was duly enacted by the Michigan Legislature, and as discussed above, it serves important governmental interests relating to ballot integrity and election administration that outweigh any alleged harm to Kennedy. And the people of Michigan have a strong public interest in having the State's election laws effectuated. "[B]oth the state and the voting

public have interests at stake. States are 'primarily responsible for regulating federal, state, and local elections,' *Sandusky Cnty Democratic Party v. Blackwell,* 387 F.3d 565, 568 (6th Cir. 2004), and have a strong interest in their ability to enforce state election law requirements." *Hunter v. Hamilton Cnty Bd of Elections*, 635 F.3d 219, 244 (6th Cir. 2011). *See also Thompson*, 959 F.3d at 812.

Further, as fully explained by Director Brater, ballots are already being printed in at least 45 counties. (Def's Ex. D, Brater Aff, ¶ 25.) Granting any relief would require counties to incur the expense of reprinting ballots with no certainty that these counties will be able to meet state and federal deadlines related to absent voter ballots or timely implement ballot programming. (*Id.*, ¶ 24.) Any delay threatens an orderly election, which the Secretary has a duty to ensure. Mich. Comp. Laws § 168.21.

As noted above, a Michigan court previously rejected a similar request for injunctive relief in *Gelineau v. Johnson.* There, the district court denied a request for injunctive relief where the candidate filed suit "just days" before the complex ballot printing process was set to commence. 896 F. Supp.2d at 683-86. The court observed that the "prejudice to the Secretary" was "abundantly clear." *Id.* at 683. Further, even if there was any merit to Kennedy's legal claims, which there is not, courts have still declined to grant relief to require reprinting ballots. *See, e.g,*

*Williams*, 393 U.S. at 34 (declining to order new ballots printed at a "late date"
even where existing ballots unconstitutionally excluded a certain candidate).

Moreover, any injunctive relief would only be temporary or preliminary, and
if the Secretary were to prevail at a later date, the harm to the State's interests
would be even greater.  Surely, the Secretary's and the public's interest weigh in
favor of judicial restraint under the circumstances.

Kennedy essentially suggests that any harm to the Secretary is self-inflicted
because she should have accepted his withdrawal in the first place or should have
declined to appeal the Michigan Court of Appeals' erroneous ruling.  (ECF No. 2,
TRO Brf, PageID.81-83.)  But the Secretary is not free to ignore the law, need not
forgo her appellate rights because of Kennedy's tardiness, and ultimately her
interpretation of the statute was upheld by the Michigan Supreme Court.

Kennedy also alleges the public interest will be served by an injunction to
avoid ballot confusion and so that voters do not "throw away votes on a withdrawn
candidate."  Of course, the harms alleged by Kennedy may just as readily be
ascribed to his own delays in seeking withdrawal and filing suit.  Further, Kennedy
has not "withdrawn" since he will still be on the ballot and thus could still accept
the will of the voters who cast ballots for him as the Natural Law Party's candidate
in the event he should prevail, as unlikely as that may be.  It is also speculative to
assume that any voter who casts their ballot for Kennedy is "throwing" their vote

away, rather than expressing their preference regardless of outcome, or supporting the Natural Law Party's ability to maintain ballot access.  *See* Mich. Comp. Laws § 168.685.  And as for voter confusion, Kennedy very publicly made his change of heart known, and may continue to do so in Michigan.  Although, Kennedy may be sowing his own voter confusion where he willingly remains a candidate in various other states.

## CONCLUSION AND RELIEF REQUESTED

For the reasons stated above, Defendant Secretary of State Jocelyn Benson respectfully requests that Plaintiff Robert F. Kennedy, Jr.'s motion for a temporary restraining order or preliminary injunction be denied.

Respectfully submitted,

*s/Erik A. Grill*
Erik A. Grill (P64713)
Heather S. Meingast (P55439)
Assistant Attorneys General
Attorneys for Defendant Benson
P.O. Box 30736
Lansing, Michigan 48909
517.335.7659
P64713

Dated:  September 12, 2024

**CERTIFICATE OF SERVICE (E-FILE)**

I hereby certify that on September 12, 2024, I electronically filed the above document(s) with the Clerk of the Court using the ECF System, which will provide electronic copies to all parties and counsel of record.

*s/Erik A. Grill*
Erik A. Grill (P64713)
Assistant Attorney General
P.O. Box 30736
Lansing, Michigan 48909
517.335.7659
P64713
